IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | |
|---|---|
| DEBRA K. DODD, **Plaintiff,** | ) ) ) |
| v. | ) ) ) Civil Action No. |
| FAYETTEVILLE CUMBERLAND PRESBYTERIAN CHURCH, and CUMBERLAND PRESBYTERIAN CHURCH GENERAL ASSEMBLY CORPORATION **Defendants** | ) ) ) JURY DEMAND ) ) ) |

## COMPLAINT

Plaintiff, Debra K. Dodd (hereinafter "Plaintiff"), through counsel brings this action for damages against Fayetteville Cumberland Presbyterian Church, and Cumberland Presbyterian Church General Assembly Corporation, and in support thereof would state the following:

## PARTIES

1. Plaintiff is a citizen of the United States of America and a resident of Mulberry, Lincoln County, Tennessee.

2. Based upon information and/or belief, Defendant Fayetteville Cumberland Presbyterian Church ("FCPC") is a domestic non-profit corporation with their principal place of business located at 1015 Lewisburg Highway, Fayetteville, TN, 37334.

3. Upon information and belief, Cumberland Presbyterian Church General Assembly Corporation ("CPCGAC"), is a domestic non-profit corporation with their principal place of business located at 8207 Traditional Place, Cordova, TN 38016-7414. Accordingly, both entities will be referred to collectively herein as "Defendants."

## JURISDICTION AND VENUE

4. This action arises out of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

1

5. Venue is proper due to the fact that the events giving rise to the claim occurred within this judicial district.

6. Plaintiff is under no legal obligation to exhaust administrative remedies prior to the bringing of this action.

## FACTS AND ALLEGATIONS

7. Not a single member of the FCPC congregation, nor any of its employees, is any race other than white.

8. Plaintiff was employed by FCPC as a church secretary from April, 2009, through May, 2011.

9. Until January 23, 2011, Plaintiff was considered by the church staff and members to be, in the words of Pastor Tim Smith, "the best secretary I've ever had." She performed her job to everyone's satisfaction, had never received any type of disciplinary action, received praise and favorable performance evaluations, and was reliable and dedicated.

10. On the evening of January 23, 2011, the Plaintiff was dining out with the man who would become her husband, and at the restaurant encountered three (3) of FCPC's elders. Until that time, no one at FCPC had met her fiancé, Michael Hampton, or known that he was black.

11. On the day following the dining incident, the Plaintiff was summoned to attend a special meeting with the FCPC Pastor, Tim Smith, the church treasurer, and the church elders.

12. Plaintiff was told that her manner of dress, which had not changed in the two years she had been working there, was vaguely described as inappropriate. Plaintiff was expressly instructed that she was not to discuss details of her personal life with any church members.

13. When Plaintiff asked for specific instances of performance deficiency, the only issue cited was one in which she may or may not have been told by the treasurer not to send a monthly check to CPCGAC in December.

14. Immediately after these events, relationships between Ms. Dodd and the elders, Pastor Smith, and several members became strained and markedly less friendly. This was in sharp contrast to their long history of friendly and warm interactions.

15. On April 4, 2011, the woman Ms. Dodd considered her mother died, and Pastor Smith and one other church member, Michelle Porter, attended the visitation at the funeral home. By that time, Ms. Dodd and Michael Hampton had married, although that information, conforming with the church's instructions had not been disclosed to any member of the church or the church staff.

16. On April 7, 2011, at the funeral home, the Pastor introduced himself to Hampton, who in turn introduced himself as the Plaintiff's husband to Pastor Smith.

17. Within days of the funeral, a former elder, Marshall Arney, visited the church office and entered the pastor's office for a conversation. Pastor Smith was easily overheard telling Mr. Arney that he finally had "proof" that Debbie was in a relationship with a black man, and that he was "floored" to find out that they had married.

18. When the Plaintiff finally did invite her husband to attend on Easter Sunday, other church members openly remarked about the "colored boys" in the back (Hampton had brought a friend).

19. In the latter part of May, 2011, Pastor Smith became very ill with what Ms. Dodd researched and found to be a very contagious and very serious infection. At the direction

3

of the elders, Ms. Dodd contacted two pastors to inquire if they could fill in for Pastor Smith for approximately one (1) month.

20. Pastor Smith and his wife communicated with the Plaintiff via text message regarding his illness, surgery, and release. Smith's wife stated to Plaintiff, "The doctor has told us that he can't be around sick people, hospitals, or nursing homes for 6 weeks. It is a large open wound stuffed with gauze … We should really not have many visitors the first week after we r home." A copy of the referenced text messages is attached hereto as Exhibit A.

21. On May 24, 2011, almost immediately upon his release from the hospital, and well before a month had passed, Pastor Smith entered the church office dressed in his pajamas, stating that he wanted to get his mileage check. This task could have easily been accomplished without requiring Smith's physical presence.

22. The Plaintiff was concerned for Pastor Smith, and worried about the contagious nature of Smith's ailment as she knew that the church office was frequently visited by the elderly, the homeless, and others who may be ill or susceptible to infection.

23. On May 24, 2011, after Smith departed, Plaintiff wrote an email to the church elders expressing her concern at Smith's premature return to the church office. A copy of that email is attached hereto as Exhibit B. As can be plainly seen, the tone of the email was one of concern for Smith's health, and for those who might be exposed to the virus.

24. On May 25, 2011, Pastor Smith wrote an email to the Plaintiff and reprimanded her for "overstepping her bounds" by writing to the elders, and reminded her that the church office was his and that he could come and go as he pleased, while she was expected to perform her duties without regard to his presence. He informed her that if she could not abide by his instructions that he would "accept her resignation at any time." The Plaintiff

4

responded to Smith reiterating her concern for the health of everyone involved, and indicated that she was happy with her job and expected to continue doing her best. A copy of this email exchange is attached hereto as Exhibit C.

25. On May 26, 2011, when the Plaintiff arrived for work, she was met in the parking lot by two of the FCPC elders, one of whom called Smith to say that she had arrived. Pastor Smith came immediately. The three of them informed the Plaintiff that she was terminated immediately, and that the church "was no longer in need of her services."

26. Immediately thereafter, Pastor Smith sent an email to the congregation stating that the Plaintiff was no longer employed by the church. The email stated, "We appreciate her service, but felt it was time for the church to move in a different direction." He stated that a search for the Plaintiff's replacement would begin immediately.

27. Ms. Dodd subsequently had a conversation with a church member, DeLois Thompson, whom the Plaintiff encountered at the local Wal-Mart on June 1, 2011. Ms. Thompson told the Plaintiff that she was told by Pastor Smith that Ms. Dodd had quit after being told her hours were being reduced.

28. Defendant CPCGAC has oversight of the ministry staff of Defendant FCPC. Section 3.400 of the Presbytery's Rules of Discipline outlines the specific procedures for discipline of ministers, while Section 3.3 outlines procedures for discipline of elders and deacons.

29. Section 5.0 of the CPCGAC's Constitution describes the function of the Presbytery. Specifically, Section 5.6 states that the presbytery is charged with pastoral oversight and has the responsibility to: "condemn erroneous opinions which hinder the peace or purity

of the church" (subparagraph i), and to "order whatever pertains to the welfare of the churches under its care" (subparagraph s).

30. CPCGAC acknowledges in its Confession of Faith that racial bigotry is contrary to Cumberland Presbyterian theology, yet they failed to adequately equip the pastor and elders at FCPC to obey all federal and state laws against discrimination, and failed to equip them in how racially discriminatory views would hinder the peace and purity in the church.

31. By failing to condemn Pastor Smith and the elders' erroneous opinions regarding racial equality, and by failing to properly discipline them under the terms of its Rules of Discipline, CPCGAC failed to exercise adequate supervision over the elders and Pastor Smith and is equally liable for the harm done to the Plaintiff.

## CAUSE OF ACTION -- RACIAL DISCRIMINATION

32. Defendants are employers within the meaning of the Civil Rights Act of 1866, 42 U.S.C. § 1981. Religious institutions are not exempted from the statute.

33. Plaintiff is an employee within the meaning of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

34. The discrimination was based on Plaintiff's relationship with a black man, and any suggestion of another motive would be mere pretext.

35. Defendants acted with malice or careless indifference to the federally protected rights of the Plaintiff, thereby entitling the Plaintiff to punitive damages.

## DEMAND FOR RELIEF

NOW, THEREFORE, for and in consideration of the premises, the Plaintiff prays for and demands the following:

6

1. That process issue upon the Defendants and they be required to file an answer within the time period prescribed by law;

2. That a jury of twelve (12) be empanelled to hear and decide all issues triable;

3. That Plaintiff be awarded back pay from May 26, 2011 to the date of judgment.

4. That Plaintiff be awarded front pay in an amount to be determined at trial

5. That Plaintiff be awarded compensatory damages in an amount to be determined at trial;

6. That Plaintiff be awarded punitive damages in an amount not less than $500,000;

**7.** That Plaintiff be awarded her reasonable attorney fees and costs incurred in prosecuting action and such discretionary costs as provided under Federal Law.

Dated this 17th day of November, 2011.

Respectfully Submitted,

s/Nanette Gould
Nanette J. Gould (#026330)
Attorney for Plaintiff
2021 Richard Jones Rd., Ste. 350
Nashville, TN 37215
(615) 383-3332
ngould@attorneyngould.com